EMPLOYER'S REINSURANCE
CORP., Plaintiff,

v.

CLARENDON NATIONAL INSURANCE
COMPANY, Defendant.

No. 01–2441–CM.

United States District Court,
D. Kansas.

March 4, 2003.

John C. Aisenbrey, Scott W. Tompsett, Stinson, Morrison, Hecker LLP, Kansas City, MO, for Plaintiff.

Jay D. DeHardt, McQuain, DeHardt & Rosenbloom, P.C., Kansas City, MO, Glen H. Kanwit, James D. Ossyra, Foley & Lardner, Chicago, IL, Michael R. Taylor, Michael R. Taylor LLC, Raymore, MO, Jack F. West, McQuain, DeHardt & Rosenbloom, P.C., Kansas City, MO, for Defendant.

### *MEMORANDUM AND ORDER*

JAMES P. O'HARA, United States Magistrate Judge.

#### I. Introduction.

Pursuant to Fed.R.Civ.P. 26(c), this case comes before the court on the motion of the defendant, Clarendon National Insurance Company ("Clarendon"), for a protective order (**doc. 61**) relating to an allegedly inadvertently produced attorney work-product document. This motion has been thoroughly briefed by the parties,[1] and the court is now prepared to rule. As explained below, the court will grant Clarendon's motion and direct the plaintiff, Employer's Reinsurance Corp. ("ERC"), to return to Clarendon all copies of the Weller affidavit. Further, the affidavit is hereby stricken from James Bain's deposition.

#### II. Factual and Procedural History.

This case arises from a dispute between ERC, a reinsurance company, and Clarendon, a provider of nonstandard automobile insurance. Both were involved in the Nu–Main Nonstandard Automobile Insurance Program (the "Nu–Main program"). Under the Nu–Main program, Clarendon's managing general agent, Nu–Main of New York, Inc. ("Nu–Main"), generated, underwrote, and administered nonstandard automobile insurance policies issued by Clarendon. ERC reinsured Clarendon's interest in the Nu–Main program during most of 2000.

Before the present lawsuit was filed, Clarendon sued Nu–Main, alleging that Nu–Main was liable for gross negligence and willful misconduct given the manner in which Nu–

Main handled claims in the Nu–Main program (the "Clarendon/Nu–Main lawsuit"). Attorneys at the law firm of Felcher Fox & Litner, P.C. ("Felcher Fox") represented Clarendon in its lawsuit against Nu–Main. The Clarendon/Nu–Main lawsuit ended when Nu–Main filed a bankruptcy petition. Then, ERC filed the present lawsuit against Clarendon. In this lawsuit, ERC alleges that Nu–Main was reckless and grossly negligent in its claims administration and underwriting, and that Clarendon was reckless and grossly negligent in its supervision of Nu–Main and the Nu–Main program.

In response to ERC's requests for production, Clarendon produced to ERC (among other things) a four-page affidavit prepared by Alfred O. Weller ("Weller"), an actuary who Felcher Fox retained during the Clarendon/Nu–Main lawsuit. The following notation appears at the top of the affidavit:

ATTORNEY WORK PRODUCT

First Draft of heading for affidavit on estimates of damages for Clarendon and Nu–Main

The affidavit states that Felcher Fox retained Weller to estimate Clarendon's damages resulting from Nu–Main's mishandling of claims. The affidavit then provides Weller's abbreviated curriculum vitae. The remainder of the affidavit contains Weller's analysis of the damages that Clarendon allegedly suffered by virtue of Nu–Main's misconduct and mishandling of claims.

After Clarendon produced this affidavit to ERC, ERC provided it (along with other documents) to Margaret Tiller Sherwood, an expert who ERC retained to estimate its damages resulting from Clarendon's and Nu–Main's alleged misconduct. Sherwood ultimately relied, in part, on the Weller affidavit when she prepared her expert report.

On August 28, 2002, ERC deposed James Bain. During that deposition, ERC marked the Weller affidavit as an exhibit. Counsel

---

1. In addition to the motion itself, the court has reviewed defendant's supporting memorandum (doc. 62), ERC's response (doc. 65), defendant's reply (doc. 72), plaintiff's surreply (doc. 90), and defendant's response to plaintiff's surreply (doc. 87). In addition, on January 13, 2003, the court

entered an order allowing the parties to submit supplemental briefs regarding two legal issues. The parties did so (docs. 85 & 86), and subsequently filed responses to the supplemental briefs (docs. 88 & 89).

for Clarendon objected, stating that he was not sure whether Clarendon had intended to produce the affidavit. He allowed ERC's attorney to question Bain about the affidavit, but reserved his right to later assert a privilege claim. Bain testified that he did not recognize the document, and he did not answer any questions about it.

Six days later, on September 3, 2002, Clarendon's counsel sent a letter to ERC's counsel, explaining that the document was privileged and that it had been produced inadvertently. Clarendon's counsel asked ERC to return all copies of the document and agree to strike the document from Bain's deposition. After a series of correspondence between the attorneys, Clarendon filed the present motion on October 17, 2002, requesting a court order directing ERC to return all copies of the document and striking the document from Bain's deposition. Briefing of the instant motion was not complete until January 24, 2003.

### III. Analysis and Discussion.

Clarendon claims that the Weller affidavit is work-product material because it was prepared for Felcher Fox by its consulting actuary in the Clarendon/Nu–Main lawsuit. On the other hand, ERC argues that Clarendon has failed to demonstrate that Weller is a non-testifying consulting expert under Fed. R.Civ.P. 26(b)(4)(B) and, therefore, Weller (and his work product) is subject to full discovery as a designated testifying expert under Fed.R.Civ.P. 26(b)(4)(A).

#### A. Discoverability of the Weller Affidavit

The court will first consider whether Weller's affidavit would have been afforded protection from discovery if it had not been produced inadvertently. Because, as explained below, if the court determines that Weller was a Rule 26(b)(4)(B)-consulting expert in the Clarendon/Nu–Main lawsuit rather than a Rule 26(b)(4)(A)-testifying expert, the court will then turn its attention to whether the protections afforded under Rule 26(b)(4)(B) extend to subsequent litigation.

#### 1. Weller's Status in the Clarendon/Nu–Main Lawsuit

"Rule 26(b)(4) governs the discovery of facts known and opinions held by experts and acquired or developed in anticipation of litigation." [2] Rule 26(b)(4)(A) allows a party to "depose any person who has been identified as an expert whose opinions may be presented at trial"—*i.e.*, a testifying expert. By comparison, Rule 26(b)(4)(B) allows a party to obtain discovery of the "facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial"—*i.e.*, a consulting expert—"only as provided in Rule 35(b) or upon a showing of exceptional circumstances[.]"

The parties dispute the standard and who has the burden of proving whether Weller was a testifying expert or a consulting expert. As stated above, the protections afforded by Rule 26(b)(4)(B) only apply to a witness "who **is not expected** to be called as a witness at trial." [3] This standard, standing alone, is not particularly helpful because it blurs the distinction between testifying experts and consulting experts based solely on whether the party who retained the expert intends to call the expert to testify at trial and, of course, those intentions may fluctuate from time to time depending upon whether that party perceives the expert's opinion will help or harm its case. However, when the language of Rule 26(b)(4)(B) is read in light the immediately preceding provision in Rule 26(b)(4)(A), the distinction is clear. By its plain language, Rule 26(b)(4)(A) only allows a party to obtain discovery from "any person **who has been identified** as an expert whose opinions may be presented at trial." [4] Thus, whether a specially retained expert is regarded as a testifying expert or a consulting expert depends upon whether the party who retained the expert has designated the ex-

---

2. 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice & Procedure § 2029, at 416 (2d ed.1994).

3. (Emphasis added.)

4. (Emphasis added.)

pert as one who is expected to be called as a witness at trial.

In this case, it is undisputed that Clarendon never identified Weller as an expert who was expected to testify at trial in the Clarendon/Nu–Main lawsuit or in this lawsuit. Therefore, Weller never has been a Rule 26(b)(4)(A)-testifying expert but, rather, was a Rule 26(b)(4)(B)-consulting expert in the Clarendon/Nu–Main lawsuit. Accordingly, facts known or opinions held by him would have been discoverable in the Clarendon/Nu–Main lawsuit "only as provided in Rule 35(b) or upon a showing of exceptional circumstances." Rule 35(b), which deals with physical and mental examinations, clearly does not apply in this situation. And ERC has not even arguably made the requisite showing of exceptional circumstances.

### 2. Whether Rule 26(b)(4)(B)'s Protections Extend to Subsequent Litigation

■ Thus, the court must now consider whether the protections afforded to the Weller affidavit in the Clarendon/Nu–Main lawsuit under Rule 26(b)(4)(B) extend to subsequent litigation. Rule 26(b)(4)(B) applies to the opinions of an expert "who has been retained or specially employed by another party **in anticipation of litigation or preparation for trial** and who is not expected to be called as a witness at trial[.]"[5] This rule does not specifically state whether it applies to subsequent litigation. However, the language is remarkably similar to the language of the rule governing the discoverability of attorney work-product material, Rule 26(b)(3), which extends to documents "otherwise discoverable ... and prepared **in anticipation of litigation or for trial** by or for another party[.]"[6]

5. (Emphasis added.)

6. (Emphasis added.)

7. 136 F.3d 695 (10th Cir.1998).

8. *Id.* at 703 (quoting *FTC v. Grolier, Inc.*, 462 U.S. 19, 25, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983)).

9. *Id.* at 703–04.

10. *See, e.g., Religious Tech. Ctr. v. F.A.C.T.Net, Inc.*, 945 F.Supp. 1470, 1480 (D.Colo.1996)

In *Frontier Refining, Inc. v. Gorman–Rupp Co.*,[7] the Tenth Circuit analyzed the language in Rule 26(b)(3). The Tenth Circuit observed that the Supreme Court had previously commented that " 'the literal language of [Rule 26(b)(3)] protects materials prepared for *any* litigation or trial as long as they were prepared by or for a party to the subsequent litigation.' "[8] The Tenth Circuit then relied on case law from other circuits to conclude that, at a bare minimum, the work-product doctrine extends to closely related subsequent litigation.[9] Under this reasoning, the undersigned magistrate judge believes that the protections afforded by Rule 26(b)(4)(B), which contains relevant language that is virtually identical to that of Rule 26(b)(3), extend, at a bare minimum, to closely related litigation. Indeed, the few federal district courts that have commented on this issue agree.[10]

In this case, the present lawsuit obviously is closely related to the Clarendon/Nu–Main lawsuit. Accordingly, the court believes that Rule 26(b)(4)(B)'s protections in the Clarendon/Nu–Main lawsuit extend to the present litigation and that the Weller affidavit would have been afforded protection from discovery in this lawsuit if Clarendon had not produced the affidavit.

### B. Inadvertent Production of the Weller Affidavit

Of course, the issue presented in this case is not whether the Weller affidavit is discoverable, but rather whether Clarendon is entitled to have it returned after producing it. The court must determine the legal standard that applies under these circumstances.

(holding Rule 26(b)(4)(B)'s protections extended to subsequent litigation); *In re Agent Orange Prod. Liab. Lit.*, 105 F.R.D. 577, 580 (E.D.N.Y. 1985) (holding Rule 26(b)(4)(B)'s protections extended to a closely related case that was part of the same multidistrict litigation); *Hermsdorfer v. American Motors Corp.*, 96 F.R.D. 13, 15 (W.D.N.Y.1982) (holding Rule 26(b)(4)(B)'s protections applied where the information sought was prepared for the subject litigation and all other similar litigation against the defendants).

### 1. *Applicable Legal Standard*

Unfortunately, neither the court nor the parties have located an on-point case with a helpful, well reasoned analysis of the legal standard that applies under these circumstances. However, several lines of authority arguably bear on this issue.

One line of authority holds that a party may prohibit discovery from a consulting expert whose previous designation as a testifying expert has been withdrawn, even if the party who retained the expert already disclosed the expert's report and/or opinion.[11] In other words, a testifying expert can be wholly converted to a consulting expert, and discovery from the expert can be prohibited by simply withdrawing the expert's designation. This approach is grounded in the policies underlying the distinction between the manner in which Rule 26(b)(4) treats testifying experts versus consulting experts. Rule 26(b)(4)(B) is designed to promote fairness by preventing access to another party's diligent trial preparation. In contrast, Rule 26(b)(4)(A) is designed to allow the opposing party an opportunity to adequately prepare for cross-examination at trial, a concern that does not exist when the expert will not be called at trial. Thus, fairness requires that Rule 26(b)(4)(B)'s protections apply to a consulting expert who will not be called to testify at trial, regardless of whether the party who retained the expert at one time had intended to call the expert to testify.

Following these policies, the court in this case could adopt a per se rule that requires an inadvertently produced document generated by a consulting expert (*e.g.*, a consulting expert's report) to be returned absent a showing of exceptional circumstances. ERC does not need the Weller affidavit in order to adequately prepare to cross-examine Weller at trial, as it is undisputed that Clarendon does not intend to call Weller as a witness at trial. Further, allowing ERC to have access to the Weller affidavit essentially would allow ERC to piggyback on Clarendon's own diligent trial preparation. Thus, it would be unfair to allow ERC to make use of the Weller affidavit in this case.

However, this line of authority does not precisely fit the present situation. The cases cited above largely involved circumstances in which courts were called upon to determine whether *further* discovery would be permitted from an expert whose status as a testifying expert had been withdrawn after a party had voluntarily produced materials generated by the expert. In this case, Clarendon seeks even greater protection of Rule 26(b)(4)(B) materials, as Clarendon wants a document that it has already produced to be *returned.* In addition, this rule of law would not allow the court to consider the significance of the fact that ERC's expert already has made use of the Weller affidavit. Further, this approach would provide counsel with little incentive to ensure that consulting expert materials are not inadvertently produced. In sum, the court does not believe that this approach is the best legal standard to apply under the present circumstances, but the court believes that the policies underlying Rule 26(b)(4)'s treatment of experts should be taken into consideration in the court's analysis.

Another line of authority suggests that the court could follow a "cat is out of the bag" approach. That is, evidence from a consulting expert loses the protection afforded by Rule 26(b)(4)(B) once it is produced.[12] This

---

11. *See, e.g., Callaway Golf Co. v. Dunlop Slazenger Group Ams., Inc.*, No. Civ. A. 01–669(MPT), 2002 WL 1906628, at *1–*4 (D.Del. Aug. 14, 2002) (collecting case law; holding that a party may prohibit discovery from a consulting expert under Rule 26(b)(4)(B) after the expert's designation as a testifying expert has been withdrawn); *FMC Corp. v. Vendo Co.*, 196 F.Supp.2d 1023, 1041–47 (E.D.Cal.2002) (same, even where the court stated that the expert's reports and opinions had been produced); *Dayton–Phoenix Group, Inc. v. General Motors Corp.*, No. C–3–95–480, 1997 WL 1764760, at *1–*2 (S.D.Ohio Feb.19, 1997) (holding that a party may prohibit

discovery under Rule 26(b)(4)(B) from a consulting expert after the expert's designation as a testifying expert has been withdrawn); *Ross v. Burlington N. R.R. Co.*, 136 F.R.D. 638, 638–39 (N.D.Ill.1991) (same).

12. *See, e.g., Ferguson v. Michael Foods, Inc.*, 189 F.R.D. 408 (D.Minn.1999) (holding the defendant's designation of an expert expected to be called at trial takes the expert out of the exceptional circumstances category of Rule 26(b)(4)(B), even if the designation is subsequently withdrawn; excluding the expert's testimony on the basis of Fed.R.Evid. 403); *Agron v. Trust-*

approach is grounded in the literal language of Rule 26(b)(4)(B), which, by its plain terms, only addresses the discoverability of evidence from an opposing party's consulting expert. Thus, once discovery from an expert has been allowed, Rule 26(b)(4)(B) no longer applies. Thereafter, the parties' dispute becomes an evidentiary one regarding admissibility at trial.

Following this approach, the court in this case could hold that Clarendon waived all protections afforded by Rule 26(b)(4)(B) when it produced the Weller affidavit, whether inadvertently or otherwise, because Rule 26(b)(4)(B) only applies to the discoverability of the Weller affidavit. Because the Weller affidavit has already been produced, Rule 26(b)(4)(B) is irrelevant, and the parties' dispute surrounding the Weller affidavit now becomes an evidentiary issue.

■ However, once again, this line of authority does not precisely fit the present situation. All of the cases cited above involved circumstances in which the parties presented their dispute to the court as an evidentiary, not a discovery, issue. They also all involved situations in which the party allowed discovery from the expert knowingly and voluntarily, whereas in this case Clarendon's production was arguably inadvertent.

Again, the court does not necessarily believe that this approach is the best legal standard to apply in this case.

Lastly, the court could apply the five-factor analysis that this court applies to attorney-client privileged and work-product documents that are allegedly inadvertently produced in discovery. Admittedly, materials such as the Weller affidavit that are generated by specially retained expert witnesses are not regarded as attorney work product.[13] Rather, the work-product rule, Rule 26(b)(3), specifically states that it is "[s]ubject to the provisions of subdivision (b)(4) of this rule." Further, the advisory committee notes to the 1970 amendments to Rule 26 explain that the "new provisions of subdivision (b)(4) ... reject as ill-considered the decisions which have sought to bring expert information within the work-product doctrine." [14] Thus, the court's five-factor analysis does not necessarily apply to allegedly inadvertently produced consulting expert materials.

Nevertheless, this is a case of first impression in this district and the court must determine some legal standard to apply to protective orders seeking the return of allegedly inadvertently produced materials from consulting experts. The protection afforded to those materials by Rule 26(b)(4)(B) certainly

*ees of Columbia Univ.*, 176 F.R.D. 445, 448–50 (S.D.N.Y.1997) (holding the plaintiff waived Rule 26(b)(4)(B)'s protections when the plaintiff voluntarily produced an expert report in discovery, even though the plaintiff subsequently withdrew the expert's designation); *House v. Combined Ins. Co. of Am.*, 168 F.R.D. 236, 245–46 (N.D.Iowa 1996) (holding that designating an expert as a trial witness waives the "free consultation" privilege, even if the designation is subsequently withdrawn); *Rubel v. Eli Lilly & Co.*, 160 F.R.D. 458, 460 (S.D.N.Y.1995) (holding the plaintiff waived Rule 26(b)(4)(B)'s protections by allowing the expert to be deposed); *Steele v. Seglie*, No. 84–2200, 1986 WL 30765, at *2–*4 (D.Kan. Mar.27, 1986) (same).

**13.** *See* 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *supra* note 2, § 2029, at 419 ("The knowledge of an expert is ... not part of the work product....").

**14.** The court acknowledges that other courts, in dicta, often suggest that expert materials are "work product." In addition, a few courts mistakenly have applied the principles of the work-product rule to expert materials. However, this

is contrary to the express language of Rule 26(b)(3) and the advisory committee notes to the 1970 amendments to Rule 26. Courts that have expressly considered this issue in a well-reasoned manner have concluded that expert materials are not entitled to the protections afforded by the attorney work-product doctrine. *See, e.g., American Crop Prot. Ass'n v. United States EPA*, 182 F.Supp.2d 89, 93 (D.D.C.2002) ("Facts known and opinions held by non-testifying experts, by themselves, ... are not work product."); *Costal Towing, Inc. v. Novarco, Ltd.*, No. Civ. A. 98–492, 1999 WL 970357, at *2 (E.D.La. Oct.21, 1999) ("Rule 26(b)(4)(B) is unrelated to the work product privilege and protects discovery of information held by non-testifying experts for reasons entirely independent of the work product doctrine."); *Vanguard Sav. & Loan Ass'n, VSL Serv. Corp. v. Banks*, No. Civ. A. 93–4627, 1995 WL 71293, at *2 (E.D.Pa. Feb.17, 1995) (considering this issue and concluding that "Rule 26(b)(4)(B) is unrelated to the work product privilege"); *see also, e.g., Heitmann v. Concrete Pipe Mach.*, 98 F.R.D. 740, 742 (E.D.Mo.1983) (rejecting the plaintiff's arguments, with respect to an expert report, "concerning work product" because they were "misplaced").

is akin to the protection afforded by the attorney-client privilege and the work-product doctrine. Further, as will be discussed below, the five-factor analysis that the court applies when a party allegedly inadvertently produces attorney-client privileged or attorney work-product documents allows the court to take into consideration the policies discussed previously as well as a number of additional factors that should, in all fairness to both parties, be considered. In sum, the court is of the opinion that the best legal standard to apply in this case is this five-factor analysis.[15]

### 2. Application of the Five Factor Inadvertent Production Analysis

■ Courts in this district apply a five-factor test to determine whether the inadvertent disclosure of a document constitutes a waiver of the attorney-client privilege or of work-product protection.[16] These five factors include: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure; (2) the time taken to rectify the error; (3) the scope of discovery; (4) the extent of disclosure; and (5) the overriding issue of fairness.[17] Thus, the court will consider each of these five factors to determine whether Clarendon has waived Rule 26(b)(4)(B)'s protection of the Weller affidavit.

#### a. Precautions Taken

■ First, the court will consider the reasonableness of the precautions Clarendon took to prevent the inadvertent disclosure. Two attorneys and a paralegal at Felcher Fox screened the documents and set aside those that they initially determined might be privileged. They then reviewed the set of documents that they had initially determined were privileged for a second time. Felcher Fox then forwarded the documents to Clarendon's attorneys in this litigation, who did not review the documents before producing them. Although it certainly would have been prudent and not particularly burdensome for Clarendon's attorneys to have glanced through the documents before producing them just to ensure that Felcher Fox performed an adequate review, Felcher Fox's precautions were reasonably adequate.[18]

However, Clarendon did not timely produce a privilege log. In fact, when Clarendon produced these documents, it did not even inform ERC that it had withheld documents on the basis of privilege or the work-product doctrine. Clarendon did not serve ERC with a privilege log until Clarendon filed the instant motion to compel, which was nearly three months after the documents were produced. Given the well-established law in this district that failure to produce a privilege log can result in a waiver of any protection afforded to those documents,[19] this consideration weighs heavily against Clarendon.[20]

---

15. *See, e.g., Martin v. Valley Nat'l Bank*, No. 89–CV–8361(PKL), 1992 WL 196798, at *1–*5 (S.D.N.Y. Aug.6, 1992) (applying the same factors that are used to evaluate the inadvertent production of attorney-client privileged and work-product documents to evaluate the inadvertent production of Rule 26(b)(4)(B) materials). *Cf., e.g., Fleet Nat'l Bank v. Tonneson & Co.*, 150 F.R.D. 10 (D.Mass.1993) (same, although the court erroneously construed the Rule 26(b)(4)(B) consulting expert materials as Rule 26(b)(3) work-product materials).

16. *Zapata v. IBP, Inc.*, 175 F.R.D. 574, 576–77 (D.Kan.1997).

17. *Wallace v. Beech Aircraft Corp.*, 179 F.R.D. 313, 314 (D.Kan.1998); *Zapata*, 175 F.R.D. at 577; *Kansas City Power & Light Co. v. Pittsburg & Midway Coal Mining Co.*, 133 F.R.D. 171, 172 (D.Kan.1989).

18. *See, e.g., Kansas City Power & Light*, 133 F.R.D. at 172 (holding the precautions were adequate where plaintiff's counsel reviewed each document and retained the withheld documents in its files); *Wallace*, 179 F.R.D. at 314 (holding the precautions were adequate where all documents were reviewed by counsel and a legal assistant before making them available for review by opposing counsel).

19. *See, e.g., Haid v. Wal–Mart Stores, Inc.*, No. 99–4186 RDR, 2001 WL 964102, at *2 (D.Kan. June 25, 2001) (holding claims of privilege were waived by failing to timely produce a privilege log); *Starlight Int'l, Inc. v. Herlihy*, No. 97–2329–GTV, 1998 WL 329268, at *3 (D.Kan. June 16, 1998) (same).

20. *See, e.g., In re Sause Bros. Ocean Towing*, 144 F.R.D. 111, 115 (D.Or.1991) (holding a party's efforts to avoid disclosure were only marginally reasonable where it did not produce a list of privileged documents until several months after the documents were produced); *Bud Antle, Inc.*

This consideration is even more troubling given the length of time that Clarendon took to produce the documents. Clarendon produced these documents on July 22, 2002, in response to discovery requests that ERC served Clarendon on March 22, 2002 and May 17, 2002. Thus, Clarendon took three to five months to produce these documents. It had ample time to prepare a privilege log and it should have done so.[21]

Admittedly, the privilege log suggests that Clarendon's production of this particular copy of the Weller affidavit was inadvertent because an identical copy of the affidavit and ten other documents created by Weller were withheld from production on the basis of privilege and work product.[22] However, the court finds it interesting that when Clarendon finally produced a privilege log, it produced more than 350 other documents that it had erroneously withheld as privileged. This suggests that counsel's initial review was imprecise.

In sum, the court is of the opinion that, although Clarendon did take some precautions to prevent inadvertent disclosure, its precautions were, on balance, deficient. Accordingly, this factor weighs in favor of finding that Clarendon waived Rule 26(b)(4)(B)'s protections.

### b. *Time to Rectify*

Next, the court will consider the time that Clarendon took to rectify the error. The relevant time frame for rectifying the inadvertent disclosure begins when a party discovers, or with reasonable diligence should have discovered, the inadvertent disclosure.[23] In this case, Clarendon sought to rectify the disclosure promptly. Counsel for Clarendon objected immediately to the use of the Weller affidavit during the Bain deposition as soon as he discovered the affidavit had been inadvertently produced. Then, only six days later, he sent a letter seeking to rectify the inadvertent disclosure. During the next two weeks, the parties exchanged correspondence in an effort to resolve this matter without court intervention. Nearly one month later, Clarendon filed the present motion. These circumstances indicate that Clarendon addressed the mistake with reasonable promptness. Therefore, this second factor weighs against finding that Clarendon waived Rule 26(b)(4)(B)'s protections.[24]

### c. *Scope of Discovery*

Clarendon produced approximately 10,800 pages (four boxes) of documents when it produced the Weller affidavit. The court has no difficulty concluding that Clarendon produced a sufficient number of documents for the court to find that this third factor weighs against finding that Clarendon waived Rule 26(b)(4)(B)'s protections.[25]

### d. *Extent of Disclosure*

The fourth factor considers the extent to which the documents were disclosed. "Meaningful use of the documents disclosed is often sufficient to find extensive disclo-

---

*v. Grow–Tech, Inc.,* 131 F.R.D. 179, 183 (N.D.Cal.1990) (finding parties did not take reasonable precautions to prevent inadvertent disclosure where they failed to produce a privilege log until six weeks after the document production).

**21.** *Cf., e.g., Zapata,* 175 F.R.D. at 577 (commenting on the short time frame—*i.e.,* 7 days—for production).

**22.** ERC's argument that Clarendon produced other documents of a similar nature is not particularly persuasive; the documents to which ERC refers are not very similar to the Weller affidavit.

**23.** *Zapata,* 175 F.R.D. at 577; *Kansas City Power & Light,* 133 F.R.D. at 172.

**24.** *See, e.g., American Cas. Co. v. Healthcare Indem., Inc.,* No. 00–2301–DJW, 2002 WL 1156273, at *2 (D.Kan. Apr.19, 2002) (finding defense counsel acted promptly to rectify the inadvertent disclosure where he took action six days after learning of the inadvertent disclosure and requested that the document be returned only two weeks later); *Kansas City Power & Light,* 133 F.R.D. at 172 (finding the plaintiff promptly sought to rectify the error within two weeks of discovering the inadvertent production).

**25.** *See, e.g., Zapata,* 175 F.R.D. at 577 (D.Kan. 1997) (finding document production was extensive where 40,000 documents were produced in discovery and 1,000 were produced with the privileged document); *Monarch Cement Co. v. Lone Star Indus.,* 132 F.R.D. 558, 560 (D.Kan. 1990) (finding document production was extensive where 9,000 documents were produced).

sure."[26] This is not a case in which disclosure of the document was limited to opposing counsel.[27] Shortly after Clarendon produced the Weller affidavit, ERC provided the affidavit to ERC's damages expert, Margaret Tiller Sherwood, and Sherwood relied on the affidavit when she rendered her expert opinion and report. Thus, the extent of disclosure would ordinarily be regarded as extensive.[28]

However, the court finds it significant that the notation "ATTORNEY WORK PRODUCT" appears clearly at the top of the affidavit.[29] Clarendon argues that, under ABA Ethics Opinion 92–368, counsel for ERC had an ethical duty to notify Clarendon that Clarendon had produced this document to ERC before ERC disclosed this document to its expert. This opinion states:

> A lawyer who receives materials that on their face appear to be subject to the attorney-privilege or otherwise confidential, under circumstances where it is clear they were not intended for the receiving lawyer, should refrain from examining the materials, notify the sending lawyer and abide the instructions of the lawyer who sent them.[30]

This ABA opinion is not binding on this court. Moreover, this court's five-factor inadvertent production test largely would be displaced if the court applied this ABA opinion to every document marked "confidential" that a party inadvertently produces in discovery.[31] Labels such as "Attorney Client Privilege" and "Attorney Work Product" are overused on documents that do not truly qualify for protection. To impose an obligation on opposing counsel to notify an adversary of every document that is produced during discovery with such a label is overkill. It would provide an incentive for commonplace use of these types of labels and would be a wholly inefficient method to monitor document production. Thus, in this case, the court is unpersuaded that ERC was ethically required to notify Clarendon that Clarendon had produced the Weller affidavit.

However, the policies underlying this ABA opinion nevertheless are instructive. They certainly indicate that an attorney who receives a document with a heading stating the document is confidential should proactively seek to determine whether opposing counsel may have produced the document inadvertently. Thus, when the attorney who re-

---

26. *American Cas.*, 2002 WL 1156273, at *3 (citing *Zapata*, 175 F.R.D. at 578).

27. *See, e.g., Monarch*, 132 F.R.D. at 560 (finding disclosure was not extensive where the document was only disseminated to opposing counsel); *Wallace*, 179 F.R.D. at 315 (same).

28. *See, e.g., American Cas.*, 2002 WL 1156273, at *3 (finding the extent of disclosure was extensive where the plaintiff disseminated the inadvertently disclosed information to its expert and the expert meaningfully considered the documents and used them in formulating his opinion and written report).

29. As discussed above, although the Weller affidavit is consulting expert material rather than attorney work-product material, the fact nevertheless remains that it would have been afforded protection from discovery under Rule 26(b)(4)(B) that is similar to the protection of the work-product doctrine, Rule 26(b)(3).

30. American Bar Association, ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 92–368 (November 10, 1992). *See generally, e.g., American Express v. Accu–Weather*, No. 91 Civ. 6485(RWS), 1996 WL 346388, at *2 (S.D.N.Y.

June 25, 1996) (counsel asked opposing counsel not to open a Federal Express Package because he had inadvertently included a privileged document, but opposing counsel nevertheless opened the package); *Furnish v. Merlo*, No. 93–1052–AS, 1994 WL 574137, at *9 (D.Or. Aug.29, 1994) (counsel knew their client took privileged documents without authorization, yet counsel retained the documents). In *Resolution Trust Corp. v. First of America Bank*, 868 F.Supp. 217 (W.D.Mich.1994), the court discussed ABA Ethics Opinion 92–368 under facts that are similar to those of this case. *Id.* at 218–20. However, in *RTC*, the inadvertently produced document was one seven-page letter that defendant's law firm inadvertently sent to plaintiff's counsel. The court specifically noted that it was "not a case wherein a legal assistant or lawyer was poring over tens of thousands of documents and ran across a few privileged documents among the many unprivileged documents." *Id.* at 220.

31. Notably, at least one jurisdiction has ruled that this ABA opinion does not apply at all during the discovery process. *See Lifewise Master Funding v. Telebank*, 206 F.R.D. 298, 302 n. 2 (D.Utah 2002) ("To apply the ABA opinion to the discovery process unnecessarily complicates the judicial discovery process, lends itself to contests over what was produced or returned.").

ceives that document provides it to an expert to use in formulating the expert's opinion, that attorney certainly ought not be heard to complain that his expert relied on the document when opposing counsel discovers that the document was inadvertently produced. That is, an attorney who receives material that is clearly labeled confidential should be estopped, so to speak, to argue that the extent of the disclosure was extensive if that attorney was the one who disseminated the document. In this case, any prejudice that ERC might suffer if the Weller affidavit is withdrawn was caused by ERC's counsel's own choice not to seek clarification regarding whether Clarendon's production of the Weller affidavit was inadvertent or intentional. Accordingly, the court finds that this fourth factor weighs in favor of Clarendon.

### e. *Fairness*

Lastly, the fifth factor is fairness. Ordinarily, the "[k]ey to the court's consideration of this factor is the relevancy of the documents." [32] The court has no difficulty concluding that the Weller affidavit is relevant to this litigation.

In this case, the court believes this factor should more predominantly involve the evaluation of the policies underlying Rule 26(b)(4)'s treatment of experts. Weller will not be called as a witness at trial. Therefore, ERC does not need his expert report in order to prepare to cross-examine him at trial. Moreover, ERC is not entitled to piggyback on the efforts of Clarendon's attorneys to establish ERC's damages. ERC presumably is perfectly capable of establishing its damages with its own expert. In sum, fairness requires that ERC not be allowed to make use of the Weller affidavit. Accordingly, this fifth factor weighs against finding a waiver.

In balancing all five factors, the court is of the opinion that, although some considerations weigh in favor of finding that Clarendon waived Rule 26(b)(4)(B)'s protections, those considerations are outweighed by other factors that indicate Clarendon's production of the Weller affidavit was inadvertent.

**32.** *Wallace,* 179 F.R.D. at 315.

### IV. Order.

In consideration of the foregoing,

IT IS HEREBY ORDERED:

1. Clarendon's motion for protective order (**doc.61**) is granted. Accordingly, within 11 days of the date that this memorandum and order is filed, counsel for ERC shall return all copies of the Weller affidavit to counsel for Clarendon. Further, the Weller affidavit is stricken from the Bain deposition.

2. The clerk shall mail copies of this memorandum and order to all counsel of record.